UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| PATRICK LEVANTINO, § <br> RASPBERRY JUNCTION § <br> PROPERTIES, LLC, AND JULIA TATE § <br> PROPERTIES, LLC § <br>     Plaintiffs § <br> § <br> V. § <br> § <br> STARWOOD MORTGAGE CAPITAL § <br> LLC, AND CHUCK WOLTER, § <br> § <br>     Defendants. § | CIVIL ACTION NO. _____ <br><br> JURY TRIAL DEMANDED |

**PLAINTIFFS' ORIGINAL COMPLAINT**

By this Complaint, Plaintiffs Patrick Levantino, Raspberry Junction Properties, LLC and Julia Tate Properties, LLC ("Plaintiffs") assert their claims against Starwood Mortgage Capital LLC and Chuck Wolter (collectively, "Defendants") and state as follows:

**I. OVERVIEW**

1. Plaintiffs sought financing from the Defendants in this lawsuit.

2. By this action, Plaintiffs seek an award of the damages, civil penalties, attorneys' fees, costs, and pre-judgment and post-judgment interest, to which he is entitled under Texas law. Pursuant to that law, Plaintiffs seeks an award, from Defendants, in excess of $3 million.

**II. PARTIES**

**A. THE PLAINTIFFS**

3. Plaintiff Patrick Levantino is an individual citizen and resident of Montgomery, Texas.

4. Plaintiff Raspberry Junction Properties, LLC ("Raspberry Junction") is a

Connecticut limited liability corporation having its headquarters at 233 Promenade Street East, Montgomery, Texas 77356 and its principal place of business at 411 Norwich-Westerly Road North Stonington, Connecticut 06359.

5.      Plaintiff Julia Tate Properties, LLC ("Julia Tate Properties") is a Connecticut limited liability corporation having its headquarters at 233 Promenade Street East, Montgomery, Texas 77356 and its principal place of business at 5 Watson Road, Preston, Connecticut 06365.

## B.  THE DEFENDANTS

6.      Defendant Starwood Mortgage Capital LLC ("Starwood") is a Delaware limited liability corporation with its principal place of business at 1601 Washington Avenue, Suite 800, Miami Beach, Florida 33139 ("Starwood Headquarters").  Starwood is a commercial real estate lender. Their commercial mortgage loans are typically secured by retail shopping centers, office buildings, multifamily apartment complexes, hotels, mixed-use and industrial properties throughout North America.

7.      Defendant Chuck Wolter ("Wolter") is a citizen and resident of North Carolina and is a former agent, employee and/or officer of Starwood.  Wolter's dwelling or usual place of abode is located at 20902 Bethelwood Lane, Cornelius, North Carolina 28031.  Mr. Wolter's place of business is located at Iron Hound Management Company LLC, 600 Lexington Avenue 30th Floor, New York, New York 10022.

## III.  JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332, in that this matter is a dispute between citizens of different states and the matter in controversy substantially exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      This Court has specific personal jurisdiction over the Defendants because the

claims asserted arise out of Defendants' transaction of business in Texas and Defendants' commission of tortious conduct in Texas which caused injury within Texas. Starwood and its agent, Chuck Wolter, engaged in extensive negotiations and due diligence in the State of Texas during the course of negotiating a commercial loan with Plaintiffs, and Starwood's representative traveled to Houston to meet with Plaintiffs' representative concerning the transaction at issue. Consequently, the Defendants have purposefully availed themselves of the privilege of conducting activities within the State of Texas, thus invoking the benefits and protections of its laws.

10. This Court has general personal jurisdiction over Defendants because Starwood engages in continuous and systematic business activity in the State of Texas. For example, Starwood has provided: (i) five individual loans totaling $57,600,000 to finance five multifamily properties consisting of 850-units located throughout Texas; (ii) a $19,500,000 first mortgage loan to finance the acquisition of Davis Springs I, II, and III, a 162,113 square foot suburban flex office business center located in Austin, Texas; (iii) a $4,300,000 first mortgage to refinance the existing commercial mortgage backed security debt on 3100 Weslayan Street, a Class B office building located in Houston, Texas and (iv) a $6,300,000 first mortgage Loan to refinance existing debt on the Hampton Inn Forth Worth.

11. Further, venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this District and within the State of Texas.

## IV. FACTUAL BACKGROUND

12. Patrick Levantino is a small business owner who lives and works in Montgomery, Texas, just outside of Houston.

13. In 2005, he formed Raspberry Junction to own real estate in North Stonington, Connecticut.

14. Raspberry Junction developed the real estate into a 164 room hotel known as the Bellissimo Grande Hotel ("Bellissimo Grande"), which opened in April 2007.

15. In 2010, Mr. Levantino formed Julia Tate Properties to own real estate in Preston, Connecticut.

16. Julia Tate Properties developed the real estate into a 165 room hotel known as the Hilton Garden Inn Preston Casino ("HGI Preston"), which opened in 2013.

17. In 2009, Raspberry Junction refinanced its construction loan with Wells Fargo. The 2009 loan was a three (3) year loan. The initial term was scheduled to conclude in 2012, but Wells Fargo provided successive loan modifications that continued to extend the loan.

18. By the middle of 2013, Mr. Levantino began the process of obtaining long term financing for both the Bellissimo Grande and HGI Preston.

19. In particular, Mr. Levantino was searching for a secured lending facility that would permit him to (i) pay-off the balance of Plaintiffs' $12 million matured credit facility with Wells Fargo; (ii) make a cash distribution to the Members of Raspberry Junction and Julia Tate Properties ("Cash-Out Payment"); and (iii) provide sufficient working capital for the operation of the Bellissimo Grande and HGI Preston.

20. In late June 2013, Mr. Levantino made a $2,500 deposit with Starwood, taking the first step toward securing financing for Plaintiffs.

21. By August 2013, Mr. Levantino and Defendants were in extensive negotiations related to two prospective ten (10) year commercial mortgage loans secured by the Bellissimo Grande and HGI Preston.

### A. Starwood's Due Diligence

22. As an Executive Vice President in charge of loan origination at Starwood, Wolter was responsible for the negotiations and due diligence related to the Plaintiffs' loan.

23. Wolter's first recommendation to Mr. Levantino was that Rasberry Junction and Julia Tate properties needed to elect an independent director in order to qualify for a loan from Starwood.

24. Wolter even provided Plaintiffs' with a list of firms that provided independent director services in early August to assist Mr. Levantino in his search.

25. After heavy negotiations throughout the month of August, Plaintiffs and Starwood came to terms in principle on September 9, 2013.

26. As of September 9, 2013, Defendants offered to provide Plaintiffs with two loans totaling $24 million for a term of ten (10) years at a fixed interest rate equal to 243 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread (approximately 5.49% at that time).

27. On September 19, 2013, Plaintiffs remitted the remainder of the $55,000 Fees and Deposits due to Starwood pursuant to the terms of the Loan Application.

28. In addition, the parties began drafting the various loan agreements to define the funding to be provided (collectively, the "Loan Agreements"). The two principal agreements that were to define these lending terms were the Loan Agreement between HGI Preston and Starwood (the "HGI Preston Loan Agreement") and the Loan Agreement between Bellissimo Grande and Starwood (the "Bellissimo Grande Loan Agreement"). The parties agreed that the Loan Agreements would also be subject to a Cross-Default, Cross-Collateralization and

Contribution Agreement between HGI Preston, Bellissimo Grande and Starwood (the "Cross Agreement").

29. Upon receipt of the remainder of the $55,000 in fees, Wolter informed Mr. Levantino that a "Legal Kickoff" call would be scheduled for the next week and that Starwood was in the process of ordering "3rd Party Reports" and would be sending Plaintiffs a "Due Diligence Checklist."

30. Around the same time, the parties began the due diligence process that included two 51-item, underwriting checklists from Defendants. Defendants represented that the items on the checklists identified the items necessary for closing and funding to occur.

31. On September 24, 2013, Wolters informed Mr. Levantino that all Third Party Reports would be completed by October 15, 2013.

32. In the last days of September, Plaintiffs continued to work toward closing the loan by searching for a new independent director and seeking Hilton Hotel & Resorts' approval of the transaction.

33. By October 1, 2013, counsel for Starwood, circulated a set draft loan documents and outstanding open items on the underwriting checklists.

34. By this time Mr. Levantino had provided Defendants with a substantial amount of financial information related to the Bellissimo Grande, including: (i) certified operating statements for the past three years; (ii) trailing 12 month certified operating statements; (iii) Current STR Report; (iv) forward Bookings Report for 12 months; (v) Demand Segmentation Report for the prior's bookings, detailing overnight stays for convention, leisure, and corporate business; and (iv) a credit authorization letter.

35. Mr. Levantino also provided Defendants with similar information on the HGI Preston.

36. By mid-October 2013, Starwood received a draft of the Third Party Engineer's Report and communications from the appraiser that the combined valuation of HGI Preston and Bellissimo Grande was valued in the low to mid-forty million dollar range which was well within the range necessary to satisfy the loan-to-valuation requirements set by Starwood.

37. Although, the loan still required documentation, Starwood had completed a signification portion of its due diligence, and on October 15, 2013, Wolter told Levantino that the loan would close in early November. Starwood had originally projected an "Outside Close Date" of October 31, 2013.

### B.  Wells Fargo Offers Better Terms to Plaintiffs

38. On October 17, 2013, Wells Fargo offered to loan Plaintiffs up to $19,597,500 at a variable rate of interest equal thirty (30) day LIBOR plus 285 basis points (approximately 3.018% at the time) for three (3) years with the option to extend the term of the loan up to an additional three (3) years (the "Wells Fargo Loan").

39. These terms were substantially more favorable than the terms offered by Starwood, as the lower interest rate would result in hundreds of thousands of dollars in savings over the life of the loan. Moreover, the loan would be a continuation of the existing lending relationship between Wells Fargo and Plaintiffs, and as result the amount of due diligence required to close the transaction was *de minimis* and the deal to amend and restate the existing loan was expected to close as soon as updated loan documentation could be prepared.

40. As a result, Mr. Levantino informed Mr. Wolter that Plaintiffs were terminating their loan application because Plaintiffs had been offered more favorable terms by Wells Fargo.

41. Mr. Levantino then asked Starwood to pay any outstanding third party invoices out of Plaintiffs' deposit and promptly remit the balance of the deposit to Plaintiffs.

42. By early November 2013, the amended and restated loan agreement with Wells Fargo was all but signed.

43. Knowing that Plaintiffs were preparing to close the Wells Fargo Loan and the terms that had been agreed upon with Wells Fargo, Defendants contacted Mr. Levantino in early November to make him an offer he could not refuse in a last ditch effort to win Plaintiffs' business.

### C. Starwood Promises to Provide Financing "On One Condition"

44. On November 4, 2013, Mr. Wolter promised in writing that Starwood approved Plaintiffs for two loans totaling $26 million for a term of ten (10) years at a fixed interest rate equal to 215 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread (approximately 4.91% at that time).

45. Defendants also increased the amount of money Mr. Levantino could take as a Cash-Out Payment at closing after paying down Plaintiffs' existing Wells Fargo loan facility and further enhanced the deal by promising that only interest payments would be required during the first 24 months of the loan. After 24 months, the principal would begin to amortize.

46. In written communication with Mr. Levantino, Defendants placed as the sole condition upon the loan that it had to "close on or before December 20th" of 2013. Defendants told Mr. Levantino that December 20, 2013 was the "drop dead" final closing date because Starwood's planned securitization required that the loan close no later than that date.

47. On November 11, 2013, in reliance on Defendants' written promises Mr. Levantino informed Wells Fargo that Plaintiffs had reached an agreement with Starwood that

would likely close within three weeks and that as a result, Plaintiffs would not be closing the Wells Fargo Loan.

48. Only after Plaintiffs had terminated the Wells Fargo Loan did Defendants forward for the first time a revised "Loan Application". The Loan Application again memorialized the loan terms promised by Defendants.

49. The parties almost immediately started the legal documentation required to memorialize the loan. During this period, checklist conferences were held weekly or biweekly. As the parties approached the closing date, the conferences became more frequent.

50. On December 12, 2013, Mr. Wolter traveled to Houston to meet with Mr. Levantino to review the financial performance of HGI Preston and Bellissimo Grande and finalize the allocation of the loan amounts to each of the respective hotels.

51. On December 16, 2013, via conference call, the closing was scheduled. Defendants said all of the "underwriting issues" had been completed and the parties agreed that a closing statement would be circulated on December 18, 2013 and that the loan would fund on December 19, 2013.

52. On December 17-18, 2013, all of the PDF versions of the final Loan Agreements and related documentation were approved by Plaintiffs' counsel.

53. The final Loan Agreements were produced to Plaintiffs on December 17, 2013, and approved by Mr. Levantino on behalf of Plaintiffs.

54. That same day Wolter left Mr. Levantino the following voice mail:

> Hey, Patrick. This is Chuck. Give me a call when you get a chance. It's 3:00 o'clock Eastern time. Had our credit committee meeting; and, really, the only thing that noteworthy come out of it, ***other than to file the deals, was they did ask, like, well, how come we can't reconcile the tax return with the operating statements***, setting up . . . . So I'm trying to have you help me reconcile your

>2012 tax return to the 2012 operating statements on . . . Anyway, give me a call.

55. Mr. Levantino walked Wolter through the translation of tax returns to GAAP operating statements to Mr. Wolter's satisfaction.

56. Despite informing Plaintiffs that the credit committee had agreed to "file the deals" and having circulated the final loan documents on the prior day, during the early morning of December 18, 2013, Mr. Wolter called Mr. Levantino to ask if he would accept $1 million less as a cash-out at the time of closing. Mr. Wolter said that he was "having a hard time with one of his investors in San Francisco." Mr. Levantino advised Mr. Wolter that he would think about taking a reduced cash-out payment if there was some reduction in the lender fees. However, later that day Mr. Wolter informed Mr. Levantino *that the loan would close on the agreed upon terms*.

57. By 5:00 PM on December 18, 2013, Plaintiffs had overnight mailed the original executed signature opinions and certified borrower organizational documents and resolutions to Defendants' counsel for receipt on December 19, 2013. Plaintiffs likewise executed the Loan Agreements and provided the signed signature pages to Defendants' counsel. Consequently, by the close of business on December 18, 2013, nothing on the underwriting checklist remained open and Plaintiffs were prepared to close the loan.

58. On December 19, 2013, only hours before the scheduled closing time, Mr. Wolter informed Plaintiffs that Starwood would not close the loan. The purported reason for the Defendants decision was their "discovery" of Massachusetts' 2011 Expanded Gaming Act authorizing the development of new casinos in the State of Massachusetts, which was signed into law over two years prior to the closing date of the loan.

59. Mr. Wolter stated that he was "sorry" and that Starwood would immediately return Plaintiffs' deposit in the amount of $45,000. That amount was returned to Plaintiffs via wire transfer on December 19, 2013.

### D. The Aftermath

60. Plaintiffs immediately began efforts to mitigate their damages caused by Defendants' conduct. Plaintiffs first sought to convince Wells Fargo to again extend Plaintiffs current loan facility and revive the Wells Fargo Loan. However, Wells Fargo refused Plaintiffs' requests for a new loan.

61. Without the use of the funds from the Starwood loan to pay off the matured existing Wells Fargo credit facility, the Plaintiffs were in technical default. Therefore, Plaintiffs were left with no choice but to quickly attempt to find new financing.

62. Although Plaintiffs were eventually able to negotiate a temporary extension of their existing agreement with Wells Fargo to avoid default, Plaintiffs incurred additional costs and penalties of approximately $52,690.

63. On April 7, 2014, Plaintiffs finally obtained alternative financing ("April 2014 Replacement Loan"), but on terms that were more expensive than that which Wells Fargo or Starwood was to provide. The new financing also required a significant decrease in Mr. Levantino's cash-out. In addition, Plaintiffs incurred hundreds of thousands of dollars in additional out-of-pocket legal and professional fees and closing costs for the new loan.

64. The approximately $3,921,734 in additional interest and $2,796,824 in additional costs that Plaintiffs' are required to pay under the terms of the Replacement Loan has all but eliminated the free cash flow of the HGI Preston and the Bellissimo Grande.

## V. CAUSES OF ACTION

### Count I: Promissory Estoppel

65. Plaintiffs re-allege and fully incorporate the allegations pleaded in the paragraphs above as if fully set forth herein.

66. Plaintiffs are entitled to judgment against the Defendants in an amount in excess of the minimum jurisdictional limits of this Court based on the theory of promissory estoppel.

67. Defendants made a promise in writing to Plaintiffs that Defendant Starwood approved a ten (10) year loan in the amount of $26 million at a fixed interest rate equal to calculated by adding 215 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread (approximately 4.91% at that time).

68. Plaintiffs reasonably and substantially relied on the promise to their detriment. Plaintiffs withdrew from the Wells Fargo Loan in reliance upon Defendants' promise of the approved financing on the above specified terms.

69. Plaintiffs informed the Defendants that they would no longer seek financing from Wells Fargo and reject Wells Fargo's financing offer on the basis that Defendants approved a ten (10) year loan in the amount of $26 million at a fixed interest rate equal to calculated by adding 215 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread. Therefore, Plaintiffs' reliance was foreseeable by the Defendants.

70. Injustice can be avoided only by awarding the Plaintiffs the amount of additional expense incurred by Plaintiffs to obtain replacement financing as well as the present value of the

difference in loan costs of the April 2014 Replacement Loan over and above the costs associated with the Wells Fargo Loan.

## Count II: Negligent Misrepresentation

71. Plaintiffs re-allege and fully incorporate the allegations pleaded in the paragraphs above as if fully set forth herein.

72. Defendants are in the business of making commercial loans collateralized by real estate.

73. In the course of Defendants' business, Defendant Wolter on behalf of Starwood falsely stated to Plaintiffs that Defendant Starwood had approved a ten (10) year loan in the amount of $26 million at a fixed interest rate equal to calculated by adding 215 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread (approximately 4.91% at that time).

74. Defendants did not exercise reasonable care or competence in making this statement to Plaintiffs.

75. Plaintiffs reasonably and substantially relied on Defendants statement to their detriment when Plaintiff withdrew from the Wells Fargo Loan in reliance upon Defendants' promise of the approved financing on the above specified terms.

76. Defendants' negligent misrepresentation as to their approval of the loan to Plaintiffs proximately caused Plaintiffs' injury in the amount of additional expense incurred by Plaintiffs to obtain replacement financing as well as the present value of the difference in loan costs of the April 2014 Replacement Loan over and above the costs associated with the Wells Fargo Loan.

### Count III:  Tortious Interference with a Prospective Business Relationship

77. Plaintiffs re-allege and fully incorporates the allegations pleaded in the paragraphs above as if fully set forth herein.

78. Based upon the existing lending relationship between Wells Fargo and Plaintiffs, the amount of due diligence required to close the loan was *de minimis* and the loan was expected to close as soon as the loan documentation could be prepared.

79. Defendants knew that Plaintiffs and Well Fargo were about to execute an amended and restated loan agreement.

80. Defendants knew that Mr. Wolter's false promise that Defendants approved Plaintiffs for two loans totaling $26 million for a term of ten (10) years at a fixed interest rate equal to 215 basis points plus the sum of the 10-year "on the run" United States Treasury obligations and the mid-market 10-year interest swap spread (approximately 4.91% at that time) was certain or substantially certain to result in the Plaintiffs and Wells Fargo not entering into a new loan agreement.

81. Defendants' conduct was independently tortious or unlawful.

82. Defendants proximately caused the injury caused to Plaintiffs in the amount of additional expense incurred by Plaintiffs to obtain replacement financing as well as the present value of the difference in loan costs of the April 2014 Replacement Loan over and above the costs associated with the Wells Fargo Loan.

### IX.  JURY DEMAND

83. Pursuant to Federal Rule of Civil Procedure 38 and Local Rule 38.1, Plaintiffs demand a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

84. For the foregoing reasons, Plaintiffs seek a jury verdict, and a judgment in their favor, awarding them:

   a. the maximum award of damages and penalties permitted by law, including the amount of additional expense incurred by Plaintiffs to obtain replacement financing as well as the present value of the difference in loan costs of the April 2014 Replacement Loan over and above the costs associated with the Wells Fargo Loan;

   b. attorneys' fees and costs; and

   c. pre-judgment and post-judgment interest at the maximum rate permitted by law.

85. Plaintiffs also request such other and further relief as to which they are justly entitled.

Dated: February 7, 2015.

        Respectfully submitted,

        DIAMOND McCARTHY LLP

        */s/ Andrea L. Kim*
        Andrea L. Kim

        *Attorneys for Plaintiffs*
        Two Houston Center
        909 Fannin Street, 15th Floor
        Houston, Texas 77010
        Phone: (713) 333-5100
        Fax:  (713) 333-5199
        E-mail: *akim@diamondmccarthy.com*